SIGN HERE

§ 553.102. Similarly, a firefighter cannot volunteer as a firefighter for the same public agency.

(c) Examples of volunteer services which do not constitute the "same type of services" include: A city police officer who volunteers as a part-time referee in a basketball league sponsored by the city; an employee of the city parks department who serves as a volunteer city firefighter; and an office employee of a city hospital or other health care institution who volunteers to spend time with a disabled or elderly person in the same institution during off duty hours as an act of charity.

### § 553.104  Private individuals who volunteer services to public agencies.

(a) Individuals who are not employed in any capacity by State or local government agencies often donate hours of service to a public agency for civic or humanitarian reasons. Such individuals are considered volunteers and not employees of such public agencies if their hours of service are provided with no promise expectation, or receipt of compensation for the services rendered, except for reimbursement for expenses, reasonable benefits, and nominal fees, or a combination thereof, as discussed in § 553.106. There are no limitations or restrictions imposed by the FLSA on the types of services which private individuals may volunteer to perform for public agencies.

(b) Examples of services which might be performed on a volunteer basis when so motivated include helping out in a sheltered workshop or providing personal services to the sick or the elderly in hospitals or nursing homes; assisting in a school library or cafeteria; or driving a school bus to carry a football team or band on a trip. Similarly, individuals may volunteer as firefighters or auxiliary police, or volunteer to perform such tasks as working with retarded or handicapped children or disadvantaged youth, helping in youth programs as camp counselors, soliciting contributions or participating in civic or charitable benefit programs and volunteering other services needed to carry out charitable or educational programs.

[52 FR 2032, Jan. 16, 1987; 52 FR 2648, Jan. 23, 1987]

### § 553.105  Mutual aid agreements.

An agreement between two or more States, political subdivisions, or interstate governmental agencies for mutual aid does not change the otherwise volunteer character of services performed by employees of such agencies pursuant to said agreement. For example, where Town A and Town B have entered into a mutual aid agreement related to fire protection, a firefighter employed by Town A who also is a volunteer firefighter for Town B will not have his or her hours of volunteer service for Town B counted as part of his or her hours of employment with Town A. The mere fact that services volunteered to Town B may in some instances involve performance in Town A's geographic jurisdiction does not require that the volunteer's hours are to be counted as hours of employment with Town A.

### § 553.106  Payment of expenses, benefits, or fees.

(a) Volunteers may be paid expenses, reasonable benefits, a nominal fee, or any combination thereof, for their service without losing their status as volunteers.

(b) An individual who performs hours of service as a volunteer for a public agency may receive payment for expenses without being deemed an employee for purposes of the FLSA. A school guard does not become an employee because he or she receives a uniform allowance, or reimbursement for reasonable cleaning expenses or for wear and tear on personal clothing worn while performing hours of volunteer service. (A uniform allowance must be reasonably limited to relieving the volunteer of the cost of providing or maintaining a required uniform from personal resources.) Such individuals would not lose their volunteer status because they are reimbursed for the approximate out-of-pocket expenses incurred incidental to providing volunteer services, for example, payment for the cost of meals and transportation expenses.

(c) Individuals do not lose their status as volunteers because they are reimbursed for tuition, transportation and meal costs involved in their attending classes intended to teach them

to perform efficiently the services they provide or will provide as volunteers. Likewise, the volunteer status of such individuals is not lost if they are provided books, supplies, or other materials essential to their volunteer training or reimbursement for the cost thereof.

(d) Individuals do not lose their volunteer status if they are provided reasonable benefits by a public agency for whom they perform volunteer services. Benefits would be considered reasonable, for example, when they involve inclusion of individual volunteers in group insurance plans (such as liability, health, life, disability, workers' compensation) or pension plans or "length of service" awards, commonly or traditionally provided to volunteers of State and local government agencies, which meet the additional test in paragraph (f) of this section.

(e) Individuals do not lose their volunteer status if they receive a nominal fee from a public agency. A nominal fee is not a substitute for compensation and must not be tied to productivity. However, this does not preclude the payment of a nominal amount on a "per call" or similar basis to volunteer firefighters. The following factors will be among those examined in determining whether a given amount is nominal: The distance traveled and the time and effort expended by the volunteer; whether the volunteer has agreed to be available around-the-clock or only during certain specified time periods; and whether the volunteer provides services as needed or throughout the year. An individual who volunteers to provide periodic services on a year-round basis may receive a nominal monthly or annual stipend or fee without losing volunteer status.

(f) Whether the furnishing of expenses, benefits, or fees would result in individuals' losing their status as volunteers under the FLSA can only be determined by examining the total amount of payments made (expenses, benefits, fees) in the context of the economic realities of the particular situation.

## Subpart C—Fire Protection and Law Enforcement Employees of Public Agencies

### GENERAL PRINCIPLES

#### § 553.200 Statutory provisions: section 13(b)(20).

(a) Section 13(b)(20) of the FLSA provides a complete overtime pay exemption for "any employee of a public agency who in any workweek is employed in fire protection activities or any employee of a public agency who in any workweek is employed in law enforcement activities (including security personnel in correctional institutions), if the public agency employs during the workweek less than 5 employees in fire protection or law enforcement activities, as the case may be."

(b) In determining whether a public agency qualifies for the section 13(b)(20) exemption, the fire protection and law enforcement activities are considered separately. Thus, if a public agency employs less than five employees in fire protection activities, but five or more employees in law enforcement activities (including security personnel in a correctional institution), it may claim the exemption for the fire protection employees but not for the law enforcement employees. No distinction is made between full-time and part-time employees, or between employees on duty and employees on leave status, and all such categories must be counted in determining whether the exemption applies. Individuals who are not considered "employees" for purposes of the FLSA by virtue of section 3(e) of the Act (including persons who are "volunteers" within the meaning of § 553.101, and "elected officials and their appointees" within the meaning of § 553.11) are not counted in determining whether the section 13(b)(20) exemption applies.

(c) The section 13(b)(20) exemption applies on a workweek basis. It is therefore possible that employees may be subject to maximum hours standard in certain workweeks, but not in others. In those workweeks in which the section 13(b)(20) exemption does not apply, the public agency is entitled to

# EXHIBITS

## Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch



USTDFD_2023_00001

**Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch**



## Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch



**Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch**



## Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch



USTDFD_2023_00005

**Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch**



## Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch



**Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch**



USTDFD_2023_00008

**Palm Pilot™ U.S. Treasury OEM FinTech Device for Samsung Smart Switch**









https://www.cardpay.international in Mobile Mode
Screen Capture in AWS Amplify

AWS Amplify

Parse



Clean header for further bespoke
systems ID configuration.

Overlay Tokenizing Vault Logo bottom of
middle code.

**FEDC Development Reference Folder**

https://www.dropbox.com/scl/fo/h22tfc7hz5e26gyo07uzs/h?rlkey=9myugnpw4tmr2hzya8vbejcze&dl=0



 Gmail                                                   Grecia Family <business@greciafamily.estate>

---

## Fwd: Grecia Estate/Qondado --- PayPal

---

**Matt Wawrzyn** <matt@wawrzynlaw.com>                              Mon, Sep 13, 2021 at 11:29 AM
To: Grecia Family <business@greciafamily.estate>

---------- Forwarded message ---------
From: **Vidal, Kathi** <KVidal@winston.com>
Date: Mon, Sep 13, 2021 at 9:08 AM
Subject: RE: Grecia Estate/Qondado --- PayPal
To: Matt Wawrzyn <matt@wawrzynlaw.com>
Cc: Kang, Robert Nai-Shu <RKang@winston.com>

Hi Matt.  I hope you had a nice round of golf and a good weekend.  Attached is the agreement I
discussed.  I look forward to hearing your thoughts.  Thank you, Kathi

**From:** Matt Wawrzyn <matt@wawrzynlaw.com>
**Sent:** Friday, September 10, 2021 12:40 PM
**To:** Vidal, Kathi <KVidal@winston.com>
**Subject:** Re: Grecia Estate/Qondado --- PayPal

Unfortunately I cannot

Sent from my iPhone

On Sep 10, 2021, at 2:25 PM, Vidal, Kathi <KVidal@winston.com> wrote:

Matt-any way we can speak before 1:45 PT? Just need 5 mins.

**From:** Matt Wawrzyn <matt@wawrzynlaw.com>
**Sent:** Wednesday, September 8, 2021 9:00 PM
**To:** Vidal, Kathi <KVidal@winston.com>
**Subject:** Re: Grecia Estate/Qondado --- PayPal

How about 3 pm pacific time? Matt

On Wed, Sep 8, 2021 at 10:16 PM Vidal, Kathi <KVidal@winston.com> wrote:                  USTDFD_2023_00012

LAST UPDATED: 13 DECEMBER 2023 AT 9:00PM EST

### Daniel Schulman Net Worth

The estimated Net Worth of Daniel H Schulman is at least ⓘ $213 Million dollars as of 1 September 2023. Mr. Schulman owns over 7,367 units of **PayPal Inc stock** worth over $34,523,096 and over the last 21 years he sold PYPL stock worth over $152,164,224. In addition, he makes $25,825,500 as President, Chief Executive Officer, and Director at PayPal Inc.

## Mr. Schulman PYPL stock SEC Form 4 insiders trading

Daniel has made over **109 trades** of the PayPal Inc stock since 2003, according to the Form 4 filled with the SEC. Most recently he exercised **7,367 units of PYPL stock worth $455,133 on 1 September 2023.**

The largest trade he's ever made was selling 920,080 units of PayPal Inc stock on 29 July 2010 worth over $4,379,581. On average, Daniel trades about 25,219 units every 40 days since 2003. As of 1 September 2023 he still owns at least ⓘ 558,807 units of **PayPal Inc** stock.

You can see the **complete history** of Mr. Schulman stock trades at the bottom of the page.

https://wallmine.com/people/10173/daniel-h-schulman

USTDFD_2023_00013



-29%          -5%          -5



Transactional | Employee Benefits & Executive Compensation | Competitive Intelligence | Intellectual Property | Legal Industry

## Winston partner's $4.8 million pay disclosed in nominee filing

By Mike Scarcella

November 4, 2021 12:43 PM EDT · Updated 2 years ago





The United States Patent and Trademark Office in Alexandria, Virginia, U.S. REUTERS/Andrew Kelly *Acquire Licensing Rights* [↗]

### Summary

- Kathi Vidal's client list includes major U.S. tech companies and online consumer platforms
- Vidal submitted divestiture proposal as part of ethics filings

(Reuters) - Kathi Vidal, the Biden administration's pick to lead the U.S. Patent and Trademark Office, reported receiving nearly $4.8 million in partnership income from Winston & Strawn since last year, according to ethics filings released on Thursday as part of the confirmation process.

Vidal's financial disclosure [↗] showed she provided legal services as a leading patent litigator and managing partner of Winston's Silicon Valley office to clients including Abbott Laboratories, Spotify USA Inc, Dell Technologies, Pinterest Inc, Snap Inc, Microsoft Corp, Airbnb Inc, PayPal Inc, Cisco Systems Inc, T-Mobile USA Inc and FedEx Corp.

USTDFD_2023_00014

**New Atlanticist** | January 25, 2024

## The Fed is falling behind as other central banks leap ahead on digital currencies

By **Josh Lipsky** and **Ananya Kumar**

This will be a year of divergence between the world's major central banks. The source of this division won't be interest rates or quantitative easing—it will be technology.

Over the past twelve months, some of the largest central banks in the world have all made significant strides forward in their development of **central bank digital currencies (CBDC)** and fast payment systems. This includes the European Central Bank (ECB), the Bank of England, the Bank of Japan, the Reserve Bank of India, and the People's Bank of China.

The Atlantic Council's GeoEconomics Center's research shows that in India, for example, testing on the digital rupee project is scaling up, reaching the milestone of more than **one million** transactions per day processed by commercial banks throughout the country. In the eurozone, the ECB is now in the preparation phase for its CBDC. On January 1, the bank laid out a detailed roadmap and benchmarks for the year ahead, including testing of a digital euro and working with a variety of private sector companies on key **design features** including offline payments and fraud prevention. Already, conversations among the central bankers in Germany, France, and Italy are centered around how high to set the limit on individual wallets and which commercial banks will work with the ECB. The reality is that central banks and legislatures across the Group of Twenty (G20) have moved past debating the theoretical merits and concerns with CBDCs, and instead are actually testing and piloting the technology to see what works and what doesn't.

Interestingly, these new pilot programs are not limited to wholesale (bank-to-bank) or retail (everyday usage) CBDCs. In addition, central banks are investing in new forms of technology in an attempt to "future-proof" their currencies for the rise of blockchain, artificial intelligence, and quantum computing—all innovations that could impact how people use money for both legal and illicit purposes.

Unfortunately, the US Federal Reserve doesn't seem to be on the same page. Right now, technological payments innovation inside the Eccles building is lagging behind its peers and competitors. One way to assess this is by the resources available within the organization for research and development. The People's Bank of China, for example, has more than three hundred **people** dedicated to working on digital currency. Across the entire US Federal Reserve system, there are fewer than twenty. The Bank of England has an official joint task force between His Majesty's Treasury and Parliament and a dedicated website to answer common questions. The innovation gap is not just on CBDCs. FedNow, the long-awaited interbank settlement system, has taken years longer than comparable systems in Europe, and take-up is **limited** in the early days.

---

The apparent belief of some inside the Fed and on Capitol Hill is that the dollar does not need to innovate. That is a miscalculation.



---

Vice Chair of the Federal Reserve Michael Barr, speaking recently on Bloomberg's **Odd Lots** podcast, said that it could take years to know if the FedNow system is working. But the future of money is not going to wait. Think of cross-border payments—an area clearly in need of an upgrade. The average cost of sending remittances internationally in 2022 was more than **6 percent**, with major differences depending on the region. (It's especially costly to send remittances to countries in sub-Saharan Africa, for example.) Meanwhile commercial banks often have to wait hours, and sometimes days, to settle large-scale transactions. In the end, many of these costs get passed on to consumers. So the idea that the system now is fine doesn't align with reality—the financial payments architecture is old, creaky, and in need of a major upgrade.

Fed officials often have ready **answers** for why these innovations are slow going. Typically their answers include not seeing a strong use case at present and wariness about unknown consequences of changing the current system. It makes sense to not want to disrupt the currency that

USTDFD_2023_00015

Case 1:24-cv-00185-KCD    Document 1-2    Filed 02/05/24    Page 19 of 37

1/29/24, 11:54 AM                 FACT SHEET: President Biden to Sign Executive Order on Ensuring Responsible Development of Digital Assets | The White House

MARCH 09, 2022

# FACT SHEET: President Biden to Sign Executive Order on Ensuring Responsible Development of Digital Assets

*Outlines First Whole-of-Government Strategy to Protect Consumers, Financial Stability, National Security, and Address Climate Risks*

Digital assets, including cryptocurrencies, have seen explosive growth in recent years, surpassing a $3 trillion market cap last November and up from $14 billion just five years prior. Surveys suggest that around 16 percent of adult Americans – approximately 40 million people – have invested in, traded, or used cryptocurrencies. Over 100 countries are exploring or piloting Central Bank Digital Currencies (CBDCs), a digital form of a country's sovereign currency.

The rise in digital assets creates an opportunity to reinforce American leadership in the global financial system and at the technological frontier, but also has substantial implications for consumer protection, financial stability, national security, and climate risk. The United States must maintain technological leadership in this rapidly growing space, supporting innovation while mitigating the risks for consumers, businesses, the broader financial system, and the climate. And, it must play a leading role in international engagement and global governance of digital assets consistent with democratic values and U.S. global competitiveness.

That is why today, President Biden will sign an Executive Order outlining the first ever, whole-of-government approach to addressing the risks and harnessing the potential benefits of digital assets and their underlying technology. The Order lays out a national policy for digital assets across six key priorities: consumer and investor protection; financial stability; illicit finance; U.S. leadership in the global financial system and economic competitiveness; financial inclusion; and responsible innovation.

USTDFD_2023_00016

Specifically, the Executive Order calls for measures to:

- **Protect U.S. Consumers, Investors, and Businesses** by directing the Department of the Treasury and other agency partners to assess and develop policy recommendations to address the implications of the growing digital asset sector and changes in financial markets for consumers, investors, businesses, and equitable economic growth. The Order also encourages regulators to ensure sufficient oversight and safeguard against any systemic financial risks posed by digital assets.

- **Protect U.S. and Global Financial Stability and Mitigate Systemic Risk** by encouraging the Financial Stability Oversight Council to identify and mitigate economy-wide (i.e., systemic) financial risks posed by digital assets and to develop appropriate policy recommendations to address any regulatory gaps.

- **Mitigate the Illicit Finance and National Security Risks Posed by the Illicit Use of Digital Assets** by directing an unprecedented focus of coordinated action across all relevant U.S. Government agencies to mitigate these risks. It also directs agencies to work with our allies and partners to ensure international frameworks, capabilities, and partnerships are aligned and responsive to risks.

- **Promote U.S. Leadership in Technology and Economic Competitiveness to Reinforce U.S. Leadership in the Global Financial System** by directing the Department of Commerce to work across the U.S. Government in establishing a framework to drive U.S. competitiveness and leadership in, and leveraging of digital asset technologies. This framework will serve as a foundation for agencies and integrate this as a priority into their policy, research and development, and operational approaches to digital assets.

- **Promote Equitable Access to Safe and Affordable Financial Services** by affirming the critical need for safe, affordable, and accessible financial services as a U.S. national interest that must inform our approach to digital asset innovation, including disparate impact risk. Such safe access is especially important for communities that have long had insufficient access to financial services. The Secretary of the Treasury, working with all relevant agencies, will produce a report on the future of money and payment systems, to include implications for economic growth, financial

growth and inclusion, national security, and the extent to which technological innovation may influence that future.

- **Support Technological Advances and Ensure Responsible Development and Use of Digital Assets** by directing the U.S. Government to take concrete steps to study and support technological advances in the responsible development, design, and implementation of digital asset systems while prioritizing privacy, security, combating illicit exploitation, and reducing negative climate impacts.

- **Explore a U.S. Central Bank Digital Currency (CBDC)** by placing urgency on research and development of a potential United States CBDC, should issuance be deemed in the national interest. The Order directs the U.S. Government to assess the technological infrastructure and capacity needs for a potential U.S. CBDC in a manner that protects Americans' interests. The Order also encourages the Federal Reserve to continue its research, development, and assessment efforts for a U.S. CBDC, including development of a plan for broader U.S. Government action in support of their work. This effort prioritizes U.S. participation in multi-country experimentation, and ensures U.S. leadership internationally to promote CBDC development that is consistent with U.S. priorities and democratic values.

The Administration will continue work across agencies and with Congress to establish policies that guard against risks and guide responsible innovation, with our allies and partners to develop aligned international capabilities that respond to national security risks, and with the private sector to study and support technological advances in digital assets.

###

MARCH 09, 2022

# Executive Order on Ensuring Responsible Development of Digital Assets

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1.  Policy.  Advances in digital and distributed ledger technology for financial services have led to dramatic growth in markets for digital assets, with profound implications for the protection of consumers, investors, and businesses, including data privacy and security; financial stability and systemic risk; crime; national security; the ability to exercise human rights; financial inclusion and equity; and energy demand and climate change.  In November 2021, non-state issued digital assets reached a combined market capitalization of $3 trillion, up from approximately $14 billion in early November 2016.  Monetary authorities globally are also exploring, and in some cases introducing, central bank digital currencies (CBDCs).

While many activities involving digital assets are within the scope of existing domestic laws and regulations, an area where the United States has been a global leader, growing development and adoption of digital assets and related innovations, as well as inconsistent controls to defend against certain key risks, necessitate an evolution and alignment of the United States Government approach to digital assets.  The United States has an interest in responsible financial innovation, expanding access to safe and affordable financial services, and reducing the cost of domestic and cross-border funds transfers and payments, including through the continued modernization of public payment systems.  We must take strong steps to reduce the risks that digital assets could pose to consumers, investors, and business protections; financial stability and financial system integrity; combating and preventing crime and illicit finance; national security; the ability to exercise human rights; financial inclusion and equity; and climate change and pollution.

Sec. 2.  Objectives.  The principal policy objectives of the United States with respect to digital assets are as follows:

USTDFD_2023_00017

(a)  We must protect consumers, investors, and businesses in the United States.  The unique and varied features of digital assets can pose significant financial risks to consumers, investors, and businesses if appropriate protections are not in place.  In the absence of sufficient oversight and standards, firms providing digital asset services may provide inadequate protections for sensitive financial data, custodial and other arrangements relating to customer assets and funds, or disclosures of risks associated with investment.  Cybersecurity and market failures at major digital asset exchanges and trading platforms have resulted in billions of dollars in losses. The United States should ensure that safeguards are in place and promote the responsible development of digital assets to protect consumers, investors, and businesses; maintain privacy; and shield against arbitrary or unlawful surveillance, which can contribute to human rights abuses.

(b)  We must protect United States and global financial stability and mitigate systemic risk.  Some digital asset trading platforms and service providers have grown rapidly in size and complexity and may not be subject to or in compliance with appropriate regulations or supervision.  Digital asset issuers, exchanges and trading platforms, and intermediaries whose activities may increase risks to financial stability, should, as appropriate, be subject to and in compliance with regulatory and supervisory standards that govern traditional market infrastructures and financial firms, in line with the general principle of "same business, same risks, same rules."  The new and unique uses and functions that digital assets can facilitate may create additional economic and financial risks requiring an evolution to a regulatory approach that adequately addresses those risks.

(c)  We must mitigate the illicit finance and national security risks posed by misuse of digital assets.  Digital assets may pose significant illicit finance risks, including money laundering, cybercrime and ransomware, narcotics and human trafficking, and terrorism and proliferation financing.  Digital assets may also be used as a tool to circumvent United States and foreign financial sanctions regimes and other tools and authorities.  Further, while the United States has been a leader in setting international standards for the regulation and supervision of digital assets for anti-money laundering and countering the financing of terrorism (AML/CFT), poor or nonexistent implementation of those standards in some jurisdictions abroad can present significant illicit financing risks for the United States and global financial systems.  Illicit actors, including the perpetrators of ransomware incidents and other cybercrime, often launder and cash out of their illicit proceeds

using digital asset service providers in jurisdictions that have not yet effectively implemented the international standards set by the inter-governmental Financial Action Task Force (FATF). The continued availability of service providers in jurisdictions where international AML/CFT standards are not effectively implemented enables financial activity without illicit finance controls. Growth in decentralized financial ecosystems, peer-to-peer payment activity, and obscured blockchain ledgers without controls to mitigate illicit finance could also present additional market and national security risks in the future. The United States must ensure appropriate controls and accountability for current and future digital assets systems to promote high standards for transparency, privacy, and security — including through regulatory, governance, and technological measures — that counter illicit activities and preserve or enhance the efficacy of our national security tools. When digital assets are abused or used in illicit ways, or undermine national security, it is in the national interest to take actions to mitigate these illicit finance and national security risks through regulation, oversight, law enforcement action, or use of other United States Government authorities.

(d)  We must reinforce United States leadership in the global financial system and in technological and economic competitiveness, including through the responsible development of payment innovations and digital assets. The United States has an interest in ensuring that it remains at the forefront of responsible development and design of digital assets and the technology that underpins new forms of payments and capital flows in the international financial system, particularly in setting standards that promote: democratic values; the rule of law; privacy; the protection of consumers, investors, and businesses; and interoperability with digital platforms, legacy architecture, and international payment systems. The United States derives significant economic and national security benefits from the central role that the United States dollar and United States financial institutions and markets play in the global financial system. Continued United States leadership in the global financial system will sustain United States financial power and promote United States economic interests.

(e)  We must promote access to safe and affordable financial services. Many Americans are underbanked and the costs of cross-border money transfers and payments are high. The United States has a strong interest in promoting responsible innovation that expands equitable access to financial services, particularly for those Americans underserved by the traditional

banking system, including by making investments and domestic and cross-border funds transfers and payments cheaper, faster, and safer, and by promoting greater and more cost-efficient access to financial products and services. The United States also has an interest in ensuring that the benefits of financial innovation are enjoyed equitably by all Americans and that any disparate impacts of financial innovation are mitigated.

(f) We must support technological advances that promote responsible development and use of digital assets. The technological architecture of different digital assets has substantial implications for privacy, national security, the operational security and resilience of financial systems, climate change, the ability to exercise human rights, and other national goals. The United States has an interest in ensuring that digital asset technologies and the digital payments ecosystem are developed, designed, and implemented in a responsible manner that includes privacy and security in their architecture, integrates features and controls that defend against illicit exploitation, and reduces negative climate impacts and environmental pollution, as may result from some cryptocurrency mining.

Sec. 3. Coordination. The Assistant to the President for National Security Affairs (APNSA) and the Assistant to the President for Economic Policy (APEP) shall coordinate, through the interagency process described in National Security Memorandum 2 of February 4, 2021 (Renewing the National Security Council System), the executive branch actions necessary to implement this order. The interagency process shall include, as appropriate: the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Commerce, the Secretary of Labor, the Secretary of Energy, the Secretary of Homeland Security, the Administrator of the Environmental Protection Agency, the Director of the Office of Management and Budget, the Director of National Intelligence, the Director of the Domestic Policy Council, the Chair of the Council of Economic Advisers, the Director of the Office of Science and Technology Policy, the Administrator of the Office of Information and Regulatory Affairs, the Director of the National Science Foundation, and the Administrator of the United States Agency for International Development. Representatives of other executive departments and agencies (agencies) and other senior officials may be invited to attend interagency meetings as appropriate, including, with due respect for their regulatory independence, representatives of the Board of Governors of the Federal Reserve System, the

Consumer Financial Protection Bureau (CFPB), the Federal Trade Commission (FTC), the Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission (CFTC), the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and other Federal regulatory agencies.

Sec. 4.  Policy and Actions Related to United States Central Bank Digital Currencies.  (a)  The policy of my Administration on a United States CBDC is as follows:

(i)    Sovereign money is at the core of a well-functioning financial system, macroeconomic stabilization policies, and economic growth.  My Administration places the highest urgency on research and development efforts into the potential design and deployment options of a United States CBDC.  These efforts should include assessments of possible benefits and risks for consumers, investors, and businesses; financial stability and systemic risk; payment systems; national security; the ability to exercise human rights; financial inclusion and equity; and the actions required to launch a United States CBDC if doing so is deemed to be in the national interest.

(ii)   My Administration sees merit in showcasing United States leadership and participation in international fora related to CBDCs and in multi-country conversations and pilot projects involving CBDCs.  Any future dollar payment system should be designed in a way that is consistent with United States priorities (as outlined in section 4(a)(i) of this order) and democratic values, including privacy protections, and that ensures the global financial system has appropriate transparency, connectivity, and platform and architecture interoperability or transferability, as appropriate.

(iii)  A United States CBDC may have the potential to support efficient and low-cost transactions, particularly for cross-border funds transfers and payments, and to foster greater access to the financial system, with fewer of the risks posed by private sector-administered digital assets.  A United States CBDC that is interoperable with CBDCs issued by other monetary authorities could facilitate faster and lower-cost cross-border payments and potentially boost economic growth, support the continued centrality of the United States within the international financial system, and help to protect the unique role that the dollar plays in global finance.  There are also, however, potential risks and downsides to consider.  We should prioritize timely assessments of potential benefits and risks under various

designs to ensure that the United States remains a leader in the international financial system.

(b)  Within 180 days of the date of this order, the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, the Secretary of Commerce, the Secretary of Homeland Security, the Director of the Office of Management and Budget, the Director of National Intelligence, and the heads of other relevant agencies, shall submit to the President a report on the future of money and payment systems, including the conditions that drive broad adoption of digital assets; the extent to which technological innovation may influence these outcomes; and the implications for the United States financial system, the modernization of and changes to payment systems, economic growth, financial inclusion, and national security.  This report shall be coordinated through the interagency process described in section 3 of this order.  Based on the potential United States CBDC design options, this report shall include an analysis of:

(i)  the potential implications of a United States CBDC, based on the possible design choices, for national interests, including implications for economic growth and stability;

(ii)  the potential implications a United States CBDC might have on financial inclusion;

(iii)  the potential relationship between a CBDC and private sector-administered digital assets;

(iv)  the future of sovereign and privately produced money globally and implications for our financial system and democracy;

(v)  the extent to which foreign CBDCs could displace existing currencies and alter the payment system in ways that could undermine United States financial centrality;

(vi)  the potential implications for national security and financial crime, including an analysis of illicit financing risks, sanctions risks, other law enforcement and national security interests, and implications for human rights; and

(vii)  an assessment of the effects that the growth of foreign CBDCs may have on United States interests generally.

(c)  The Chairman of the Board of Governors of the Federal Reserve System (Chairman of the Federal Reserve) is encouraged to continue to research and report on the extent to which CBDCs could improve the efficiency and reduce the costs of existing and future payments systems, to continue to assess the optimal form of a United States CBDC, and to develop

a strategic plan for Federal Reserve and broader United States Government action, as appropriate, that evaluates the necessary steps and requirements for the potential implementation and launch of a United States CBDC. The Chairman of the Federal Reserve is also encouraged to evaluate the extent to which a United States CBDC, based on the potential design options, could enhance or impede the ability of monetary policy to function effectively as a critical macroeconomic stabilization tool.

(d)  The Attorney General, in consultation with the Secretary of the Treasury and the Chairman of the Federal Reserve, shall:

(i)  within 180 days of the date of this order, provide to the President through the APNSA and APEP an assessment of whether legislative changes would be necessary to issue a United States CBDC, should it be deemed appropriate and in the national interest; and

(ii)  within 210 days of the date of this order, provide to the President through the APNSA and the APEP a corresponding legislative proposal, based on consideration of the report submitted by the Secretary of the Treasury under section 4(b) of this order and any materials developed by the Chairman of the Federal Reserve consistent with section 4(c) of this order.

Sec. 5.  Measures to Protect Consumers, Investors, and Businesses.  (a)  The increased use of digital assets and digital asset exchanges and trading platforms may increase the risks of crimes such as fraud and theft, other statutory and regulatory violations, privacy and data breaches, unfair and abusive acts or practices, and other cyber incidents faced by consumers, investors, and businesses.  The rise in use of digital assets, and differences across communities, may also present disparate financial risk to less informed market participants or exacerbate inequities.  It is critical to ensure that digital assets do not pose undue risks to consumers, investors, or businesses, and to put in place protections as a part of efforts to expand access to safe and affordable financial services.

(b)  Consistent with the goals stated in section 5(a) of this order:

(i)   Within 180 days of the date of this order, the Secretary of the Treasury, in consultation with the Secretary of Labor and the heads of other relevant agencies, including, as appropriate, the heads of independent regulatory agencies such as the FTC, the SEC, the CFTC, Federal banking agencies, and the CFPB, shall submit to the President a report, or section of the report required by section 4 of this order, on the implications of

developments and adoption of digital assets and changes in financial market and payment system infrastructures for United States consumers, investors, businesses, and for equitable economic growth.  One section of the report shall address the conditions that would drive mass adoption of different types of digital assets and the risks and opportunities such growth might present to United States consumers, investors, and businesses, including a focus on how technological innovation may impact these efforts and with an eye toward those most vulnerable to disparate impacts.  The report shall also include policy recommendations, including potential regulatory and legislative actions, as appropriate, to protect United States consumers, investors, and businesses, and support expanding access to safe and affordable financial services.  The report shall be coordinated through the interagency process described in section 3 of this order.

(ii)   Within 180 days of the date of this order, the Director of the Office of Science and Technology Policy and the Chief Technology Officer of the United States, in consultation with the Secretary of the Treasury, the Chairman of the Federal Reserve, and the heads of other relevant agencies, shall submit to the President a technical evaluation of the technological infrastructure, capacity, and expertise that would be necessary at relevant agencies to facilitate and support the introduction of a CBDC system should one be proposed.  The evaluation should specifically address the technical risks of the various designs, including with respect to emerging and future technological developments, such as quantum computing.  The evaluation should also include any reflections or recommendations on how the inclusion of digital assets in Federal processes may affect the work of the United States Government and the provision of Government services, including risks and benefits to cybersecurity, customer experience, and social-safety-net programs.  The evaluation shall be coordinated through the interagency process described in section 3 of this order.

(iii)   Within 180 days of the date of this order, the Attorney General, in consultation with the Secretary of the Treasury and the Secretary of Homeland Security, shall submit to the President a report on the role of law enforcement agencies in detecting, investigating, and prosecuting criminal activity related to digital assets.  The report shall include any recommendations on regulatory or legislative actions, as appropriate.

(iv)   The Attorney General, the Chair of the FTC, and the Director of the CFPB are each encouraged to consider what, if any, effects the growth of digital assets could have on competition policy.

(v)    The Chair of the FTC and the Director of the CFPB are each encouraged to consider the extent to which privacy or consumer protection measures within their respective jurisdictions may be used to protect users of digital assets and whether additional measures may be needed.

(vi)    The Chair of the SEC, the Chairman of the CFTC, the Chairman of the Federal Reserve, the Chairperson of the Board of Directors of the Federal Deposit Insurance Corporation, and the Comptroller of the Currency are each encouraged to consider the extent to which investor and market protection measures within their respective jurisdictions may be used to address the risks of digital assets and whether additional measures may be needed.

(vii)    Within 180 days of the date of this order, the Director of the Office of Science and Technology Policy, in consultation with the Secretary of the Treasury, the Secretary of Energy, the Administrator of the Environmental Protection Agency, the Chair of the Council of Economic Advisers, the Assistant to the President and National Climate Advisor, and the heads of other relevant agencies, shall submit a report to the President on the connections between distributed ledger technology and short-, medium-, and long-term economic and energy transitions; the potential for these technologies to impede or advance efforts to tackle climate change at home and abroad; and the impacts these technologies have on the environment. This report shall be coordinated through the interagency process described in section 3 of this order.  The report should also address the effect of cryptocurrencies' consensus mechanisms on energy usage, including research into potential mitigating measures and alternative mechanisms of consensus and the design tradeoffs those may entail.  The report should specifically address:

(A)  potential uses of blockchain that could support monitoring or mitigating technologies to climate impacts, such as exchanging of liabilities for greenhouse gas emissions, water, and other natural or environmental assets; and

(B)  implications for energy policy, including as it relates to grid management and reliability, energy efficiency incentives and standards, and sources of energy supply.

(viii)    Within 1 year of submission of the report described in section 5(b)(vii) of this order, the Director of the Office of Science and Technology Policy, in consultation with the Secretary of the Treasury, the

Secretary of Energy, the Administrator of the Environmental Protection Agency, the Chair of the Council of Economic Advisers, and the heads of other relevant agencies, shall update the report described in section 5(b)(vii) of this order, including to address any knowledge gaps identified in such report.

Sec. 6. Actions to Promote Financial Stability, Mitigate Systemic Risk, and Strengthen Market Integrity.  (a)  Financial regulators — including the SEC, the CFTC, and the CFPB and Federal banking agencies — play critical roles in establishing and overseeing protections across the financial system that safeguard its integrity and promote its stability.  Since 2017, the Secretary of the Treasury has convened the Financial Stability Oversight Council (FSOC) to assess the financial stability risks and regulatory gaps posed by the ongoing adoption of digital assets.  The United States must assess and take steps to address risks that digital assets pose to financial stability and financial market integrity.

(b)  Within 210 days of the date of this order, the Secretary of the Treasury should convene the FSOC and produce a report outlining the specific financial stability risks and regulatory gaps posed by various types of digital assets and providing recommendations to address such risks.  As the Secretary of the Treasury and the FSOC deem appropriate, the report should consider the particular features of various types of digital assets and include recommendations that address the identified financial stability risks posed by these digital assets, including any proposals for additional or adjusted regulation and supervision as well as for new legislation.  The report should take account of the prior analyses and assessments of the FSOC, agencies, and the President's Working Group on Financial Markets, including the ongoing work of the Federal banking agencies, as appropriate.

Sec. 7. Actions to Limit Illicit Finance and Associated National Security Risks.  (a)  Digital assets have facilitated sophisticated cybercrime-related financial networks and activity, including through ransomware activity.  The growing use of digital assets in financial activity heightens risks of crimes such as money laundering, terrorist and proliferation financing, fraud and theft schemes, and corruption.  These illicit activities highlight the need for ongoing scrutiny of the use of digital assets, the extent to which technological innovation may impact such activities, and exploration of opportunities to mitigate these risks through regulation, supervision,

public-private engagement, oversight, and law enforcement.

(b)  Within 90 days of submission to the Congress of the National Strategy for Combating Terrorist and Other Illicit Financing, the Secretary of the Treasury, the Secretary of State, the Attorney General, the Secretary of Commerce, the Secretary of Homeland Security, the Director of the Office of Management and Budget, the Director of National Intelligence, and the heads of other relevant agencies may each submit to the President supplemental annexes, which may be classified or unclassified, to the Strategy offering additional views on illicit finance risks posed by digital assets, including cryptocurrencies, stablecoins, CBDCs, and trends in the use of digital assets by illicit actors.

(c)  Within 120 days of submission to the Congress of the National Strategy for Combating Terrorist and Other Illicit Financing, the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, the Secretary of Commerce, the Secretary of Homeland Security, the Director of the Office of Management and Budget, the Director of National Intelligence, and the heads of other relevant agencies shall develop a coordinated action plan based on the Strategy's conclusions for mitigating the digital-asset-related illicit finance and national security risks addressed in the updated strategy.  This action plan shall be coordinated through the interagency process described in section 3 of this order.  The action plan shall address the role of law enforcement and measures to increase financial services providers' compliance with AML/CFT obligations related to digital asset activities.

(d)  Within 120 days following completion of all of the following reports — the National Money Laundering Risk Assessment; the National Terrorist Financing Risk Assessment; the National Proliferation Financing Risk Assessment; and the updated National Strategy for Combating Terrorist and Other Illicit Financing — the Secretary of the Treasury shall notify the relevant agencies through the interagency process described in section 3 of this order on any pending, proposed, or prospective rulemakings to address digital asset illicit finance risks.  The Secretary of the Treasury shall consult with and consider the perspectives of relevant agencies in evaluating opportunities to mitigate such risks through regulation.

Sec. 8.  Policy and Actions Related to Fostering International Cooperation and United States Competitiveness.  (a)  The policy of my Administration on fostering international cooperation and United States competitiveness with

respect to digital assets and financial innovation is as follows:

(i)  Technology-driven financial innovation is frequently cross-border and therefore requires international cooperation among public authorities.  This cooperation is critical to maintaining high regulatory standards and a level playing field.  Uneven regulation, supervision, and compliance across jurisdictions creates opportunities for arbitrage and raises risks to financial stability and the protection of consumers, investors, businesses, and markets.  Inadequate AML/CFT regulation, supervision, and enforcement by other countries challenges the ability of the United States to investigate illicit digital asset transaction flows that frequently jump overseas, as is often the case in ransomware payments and other cybercrime-related money laundering.  There must also be cooperation to reduce inefficiencies in international funds transfer and payment systems.

(ii)  The United States Government has been active in international fora and through bilateral partnerships on many of these issues and has a robust agenda to continue this work in the coming years.  While the United States held the position of President of the FATF, the United States led the group in developing and adopting the first international standards on digital assets.  The United States must continue to work with international partners on standards for the development and appropriate interoperability of digital payment architectures and CBDCs to reduce payment inefficiencies and ensure that any new funds transfer and payment systems are consistent with United States values and legal requirements.

(iii)  While the United States held the position of President of the 2020 G7, the United States established the G7 Digital Payments Experts Group to discuss CBDCs, stablecoins, and other digital payment issues.  The G7 report outlining a set of policy principles for CBDCs is an important contribution to establishing guidelines for jurisdictions for the exploration and potential development of CBDCs.  While a CBDC would be issued by a country's central bank, the supporting infrastructure could involve both public and private participants.  The G7 report highlighted that any CBDC should be grounded in the G7's long-standing public commitments to transparency, the rule of law, and sound economic governance, as well as the promotion of competition and innovation.

(iv)  The United States continues to support the G20 roadmap for addressing challenges and frictions with cross-border funds transfers and payments for which work is underway, including work on improvements to existing systems for cross-border funds transfers and payments, the

international dimensions of CBDC designs, and the potential of well-regulated stablecoin arrangements.  The international Financial Stability Board (FSB), together with standard-setting bodies, is leading work on issues related to stablecoins, cross-border funds transfers and payments, and other international dimensions of digital assets and payments, while FATF continues its leadership in setting AML/CFT standards for digital assets. Such international work should continue to address the full spectrum of issues and challenges raised by digital assets, including financial stability, consumer, investor, and business risks, and money laundering, terrorist financing, proliferation financing, sanctions evasion, and other illicit activities.

(v)    My Administration will elevate the importance of these topics and expand engagement with our critical international partners, including through fora such as the G7, G20, FATF, and FSB.  My Administration will support the ongoing international work and, where appropriate, push for additional work to drive development and implementation of holistic standards, cooperation and coordination, and information sharing.  With respect to digital assets, my Administration will seek to ensure that our core democratic values are respected; consumers, investors, and businesses are protected; appropriate global financial system connectivity and platform and architecture interoperability are preserved; and the safety and soundness of the global financial system and international monetary system are maintained.

(b) In furtherance of the policy stated in section 8(a) of this order:

(i)    Within 120 days of the date of this order, the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Commerce, the Administrator of the United States Agency for International Development, and the heads of other relevant agencies, shall establish a framework for interagency international engagement with foreign counterparts and in international fora to, as appropriate, adapt, update, and enhance adoption of global principles and standards for how digital assets are used and transacted, and to promote development of digital asset and CBDC technologies consistent with our values and legal requirements.  This framework shall be coordinated through the interagency process described in section 3 of this order.  This framework shall include specific and prioritized lines of effort and coordinated messaging; interagency engagement and activities with foreign partners, such as foreign assistance and capacity-building efforts and coordination of global compliance; and

whole-of-government efforts to promote international principles, standards, and best practices. This framework should reflect ongoing leadership by the Secretary of the Treasury and financial regulators in relevant international financial standards bodies, and should elevate United States engagement on digital assets issues in technical standards bodies and other international fora to promote development of digital asset and CBDC technologies consistent with our values.

(ii)    Within 1 year of the date of the establishment of the framework required by section 8(b)(i) of this order, the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Commerce, the Director of the Office of Management and Budget, the Administrator of the United States Agency for International Development, and the heads of other relevant agencies as appropriate, shall submit a report to the President on priority actions taken under the framework and its effectiveness. This report shall be coordinated through the interagency process described in section 3 of this order.

(iii)    Within 180 days of the date of this order, the Secretary of Commerce, in consultation with the Secretary of State, the Secretary of the Treasury, and the heads of other relevant agencies, shall establish a framework for enhancing United States economic competitiveness in, and leveraging of, digital asset technologies. This framework shall be coordinated through the interagency process described in section 3 of this order.

(iv)    Within 90 days of the date of this order, the Attorney General, in consultation with the Secretary of State, the Secretary of the Treasury, and the Secretary of Homeland Security, shall submit a report to the President on how to strengthen international law enforcement cooperation for detecting, investigating, and prosecuting criminal activity related to digital assets.

Sec. 9.  Definitions.  For the purposes of this order:

(a)    The term "blockchain" refers to distributed ledger technologies where data is shared across a network that creates a digital ledger of verified transactions or information among network participants and the data are typically linked using cryptography to maintain the integrity of the ledger and execute other functions, including transfer of ownership or value.

(b)    The term "central bank digital currency" or "CBDC" refers to a form of digital money or monetary value, denominated in the national unit of

account, that is a direct liability of the central bank.

(c)  The term "cryptocurrencies" refers to a digital asset, which may be a medium of exchange, for which generation or ownership records are supported through a distributed ledger technology that relies on cryptography, such as a blockchain.

(d)  The term "digital assets" refers to all CBDCs, regardless of the technology used, and to other representations of value, financial assets and instruments, or claims that are used to make payments or investments, or to transmit or exchange funds or the equivalent thereof, that are issued or represented in digital form through the use of distributed ledger technology. For example, digital assets include cryptocurrencies, stablecoins, and CBDCs. Regardless of the label used, a digital asset may be, among other things, a security, a commodity, a derivative, or other financial product.  Digital assets may be exchanged across digital asset trading platforms, including centralized and decentralized finance platforms, or through peer-to-peer technologies.

(e)  The term "stablecoins" refers to a category of cryptocurrencies with mechanisms that are aimed at maintaining a stable value, such as by pegging the value of the coin to a specific currency, asset, or pool of assets or by algorithmically controlling supply in response to changes in demand in order to stabilize value.

Sec. 10.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,

March 9, 2022.